IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 14, 2004

## STATE OF TENNESSEE v. ELLIS J. BURNETT

**Direct Appeal from the Circuit Court for Cannon County**
**No. F-2406     James K. Clayton, Jr., Judge**

_____

**No. M2001-01495-CCA-R3-CD - Filed June 6, 2005**

_____

The appellant, Ellis J. Burnett, was convicted by a jury in the Cannon County Circuit Court of aggravated arson. He received a sentence of twenty-three years incarceration in the Tennessee Department of Correction. On appeal, the appellant challenges the sufficiency of the evidence, the jury instructions, the prosecutor's closing argument, the trial court's evidentiary rulings, and alleges the ineffective assistance of counsel. Upon our review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

David Wayne Piper, Woodbury, Tennessee (at trial) and Daryl M. South, Murfreesboro, Tennessee (at trial and on appeal), for the appellant, Ellis J. Burnett.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; and David L. Puckett, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

### I.  Factual Background

In January 1996, the appellant was indicted by the Cannon County Grand Jury for aggravated arson.[1]  In the light most favorable to the State, the proof adduced at trial revealed that at approximately 9:00 p.m. on November 8, 1995, Melissa Burnett was baking cupcakes in the kitchen

---

[1] The appellant was previously convicted of aggravated arson based upon the facts recounted herein; however, his previous conviction was reversed and remanded for new trial. See State v. Ellis Junior Burnett, No. M1999-00179-CCA-R3-CD, 2000 WL 62110, at *1 (Tenn. Crim. App. at Nashville, Jan. 26, 2000).

of her home at 549 Hollow Springs Road in Cannon County while her husband, Tony, and her six-year-old son, Thomas, slept in their respective bedrooms. After hearing a car door slam, Melissa looked out of her kitchen door and saw a red glow "going through my yard and across the road."[2] Melissa believed that the red glow was fire. She went to look out the door of her living room and saw that the fire was burning on the gas meter of her house, trailing through the road, and running across the street to a tree. Melissa began to panic and ran to wake her husband.

Tony and Melissa then ran outside to combat the flames. The area that was burning smelled of gasoline. Once outside, Tony observed "a line of fire from behind a tree across the road all the way under my gas meter." The gas meter and the side of the house were in flames. The fire extended from the side of the Burnetts' home and across the road near a field of high grass. As they were fighting the fire, the Burnetts saw a small, green Datsun hatchback being driven on the road in front of their house. The vehicle had two occupants. The driver did not stop the vehicle to investigate the fire. In fact, the driver drove through the flames that crossed the road and left the area. Tony, who was an officer with the Woodbury Police Department, recognized the vehicle as belonging to Timmy Elkins, an individual Tony had recently arrested for drugs.

While the Burnetts were fighting the fire with water from a garden hose and a towel, Tony called Officer Kevin Mooneyham, whom he knew was on duty at that time, and requested that Officer Mooneyham find and detain the occupants of the green Datsun for questioning. Tony also called David Pruitt, a deputy with the Warren County Sheriff's Department, to request that he stop the vehicle if he encountered it before Officer Mooneyham.

Officer Mooneyham ultimately stopped the green Datsun. The appellant emerged from the front passenger side of the vehicle and asked Officer Mooneyham "what was going on." Officer Mooneyham was unable to answer because he did not know at that time why he had been requested to stop the vehicle. As Officer Mooneyham approached the appellant, he detected a "moderate odor of gasoline" coming from the vehicle. Additionally, Officer Mooneyham observed a gas can in the rear compartment of the vehicle.

Upon approaching the vehicle, Officer Mooneyham recognized that the driver was Wynona Parker. Officer Mooneyham knew that Parker's driver's license had been revoked; therefore, he arrested her for driving on a revoked license.

Deputy Pruitt and Tony Burnett arrived on the scene while Officer Mooneyham had the occupants of the green Datsun detained. Tony saw his uncle, the appellant, near the green Datsun. The two men engaged in a verbal altercation, and Deputy Pruitt separated them. Shortly thereafter, Tony observed a two-gallon gas can in the rear compartment of the vehicle. He noted that the nozzle of the gas can "was wet as if it had been used that night." Tony believed that the appellant was involved in the fire "[b]ecause I knew that a fire bug always returns back to the scene, and he was

---

[2] Some of the witnesses in this case share a surname. Therefore, for clarity, we have chosen to utilize their first names. We mean no disrespect to these individuals.

in that car and that jug was in that backseat and it appeared as if it had just been used, and he was a passenger in that vehicle."

A tow truck arrived to impound the green Datsun. The gas can was not removed from the vehicle when it was impounded. Deputy Pruitt drove the appellant home. Deputy Pruitt noticed that the appellant's tennis shoes and his pants below the ankle were wet. Additionally, when the appellant exited the vehicle, Deputy Pruitt noticed wet spots and grass seeds where the appellant's feet had been.

The next day, Tom Carmooch, an agent with the Tennessee Bureau of Investigation (TBI), began investigating the fire. Agent Carmooch went to the Burnetts' home and noticed that "[a]cross the road in front of [the] house was a large tree, and there was a black trail or mark from that tree, around behind it, across the road, and going to the gas meter or the gas system, to the heating unit of [the] house." Later that day, Agent Carmooch went to the impound lot and obtained the gas can from the rear compartment of the green Datsun. The gas can was approximately half-full of fuel. Shortly thereafter, Agent Carmooch relinquished the gas can and the investigation to TBI arson investigator Larry Dauberman.[3]

Agent Dauberman testified that during the course of his investigation, he and Agent Carmooch went to the appellant's home. Agent Dauberman testified that the appellant insisted that he was innocent and that Elkins, the owner of the green Datsun, was the perpetrator of the crime. Thereafter, following the appellant's indictment by the Grand Jury, the appellant agreed to cooperate with a plan designed to get Elkins to incriminate himself. Agent Dauberman, representing the District Attorney General's office, and David Dinkins, an investigator with the Public Defender's office, coordinated the operation.

A wireless transmitter was placed on the appellant, and he then went to Elkins' home. Agent Dauberman instructed the appellant on the type of questions he should ask and the information that was needed to incriminate Elkins in the fire. The appellant was wired for sound on two occasions, and, thereafter, he went to Elkins' residence. Although the appellant was explicitly instructed to question Elkins regarding the fire, the appellant failed to do so on both occasions. Instead, the appellant asked Elkins "social-type questions" and discussed his impending arson charges, noting his need for money and an attorney. Dinkins recalled that on the second occasion, while they were discussing the appellant's legal problems, Elkins informed the appellant, "I'm going to keep my mouth shut." The appellant responded, "I appreciate it." Further attempts to use the appellant to gain information against Elkins were abandoned.

Additionally, Agent Dauberman testified that when he went to the Burnetts' home he saw the black burn trail left by the fire. He concluded that the trail was indicative of the use of a liquid accelerant. The accelerant appeared to be concentrated around the gas meter. The left end of the home had a black smoke stain that was ten to twelve feet high, which stain indicated that the fire had

---

[3] Dauberman's surname is also spelled "Dobberman" and "Doberman" in the record.

produced black soot common to fire from "hydro-carbon based fuel" such as gasoline or kerosene. Agent Dauberman took a sample of the soil from around the gas meter and submitted the soil sample and a fuel sample from the gas can found in the green Datsun to the TBI crime laboratory for testing. The gas can was also tested for fingerprints.

At the TBI crime laboratory, no viable fingerprints were found on the gas can because it was constructed of "very textured, hard plastic" that was not conducive to the lifting of latent fingerprints. Agent Sandra Evans, a forensic scientist with the TBI crime laboratory, tested the soil sample and the fuel sample. Both samples contained "gasoline range petroleum distillate" and "kerosene range distillate." The testing revealed that both samples contained "a very strong gasoline presence and a very weak kerosene presence." Agent Evans opined that the samples from the soil and from the gas can were "very similar."

Based upon the foregoing, the jury convicted the appellant of aggravated arson. The trial court sentenced the appellant as a Range I standard offender to twenty-three years incarceration. On appeal, the appellant contends that there was insufficient evidence to support his conviction; the trial court erred in failing to instruct the jury fully on circumstantial evidence; the prosecutor made inappropriate statements during closing argument; the trial court should have excluded "evidence regarding the [appellant's] cooperation with law enforcement officials and his use of surveillance equipment"; and the appellant received the ineffective assistance of counsel.

## II. Analysis

### A. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no "reasonable trier of fact" could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

A person commits arson when that person "knowingly damages any structure by means of a fire or explosion . . . without the consent of all persons who have a possessory, proprietary or security interest therein." Tenn. Code Ann. § 39-14-301(a)(1) (1997). Aggravated arson occurs when a person commits arson when one or more persons are present inside the structure. See Tenn.

-4-

Code Ann. § 39-14-302(a)(1) (1997). The proof is undisputed that Tony, Melissa, and Thomas Burnett were inside the home during the fire. Additionally, Tony testified that no one had consent to set fire to his home. Moreover, there was evidence that the structure was damaged during the fire.

The appellant's chief complaint appears to be that there was insufficient evidence to identify him as the perpetrator. However, we conclude that there was considerable circumstantial evidence that the appellant was the perpetrator. He was seen in the area at the time of the fire. The vehicle he was in contained a gas can that was half-full of fuel. The vehicle also smelled strongly of gasoline. The fuel in the can was very similar to the fuel used to start the fire. Also, the nozzle of the gas can was wet, an indication that fuel had recently been poured from it. The appellant's pants and shoes were wet and were studded with grass seeds. The field across from the Burnetts' home was filled with tall grass that had gone to seed. We conclude that the foregoing facts were sufficient to sustain the appellant's conviction for aggravated arson.

## B. Evidentiary Ruling

Next, the appellant contends that "the trial court erred in refusing to grant [the appellant's] motion to exclude evidence regarding [the appellant's] cooperation with law enforcement officials and his use of surveillance equipment." Specifically, the appellant alleges that the testimony of Agent Dauberman and Investigator Dinkins regarding the appellant's failure to ask Elkins questions which might have incriminated Elkins in the crime should not have been admissible. The appellant argues that the testimony was irrelevant, or, if relevant, unduly prejudicial.

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; see also State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999). Tennessee Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible except as [otherwise] provided. . . . Evidence which is not relevant is not admissible." However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. It is within the trial court's discretion to determine whether the proffered evidence is relevant; thus, we will not overturn the trial court's decision absent an abuse of discretion. See State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995).[4]

First, we must determine if the contested proof is relevant. As we noted earlier, Agent Dauberman and Investigator Dinkins testified that the appellant was thoroughly instructed on how to question Elkins regarding the fire in order to incriminate Elkins and exculpate the appellant. Despite the instructions, the appellant did not attempt to elicit incriminating information from Elkins on either occasion when he was wired for sound. Instead, the appellant and Elkins engaged in casual

---

[4] We note that the trial court did not make a specific finding as to relevancy, or as to the balancing test between probative value and prejudicial effect.

conversation regarding the appellant's impending arson charges. During the second meeting, while they were discussing the appellant's legal problems, Elkins informed the appellant, "I'm going to keep my mouth shut." The appellant responded, "I appreciate it." We note that in ruling on this issue, the trial court stated, "I feel like it is admissible. . . . I think it bears on his state of mind to try to direct the attention away from himself." We agree that the evidence was relevant. At trial, the appellant's theory of defense was that Elkins was the perpetrator of the crime. Yet, when given the opportunity to elicit incriminating evidence from Elkins, the appellant did not attempt to do so, and notably expressed his appreciation to Elkins for his promise to remain quiet. We cannot conclude that the risk of undue prejudice outweighs the probative value of the testimony.

## C. Closing Argument

Next, we will turn to the appellant's complaint that the State in its rebuttal closing argument "on at least two separate occasions spoke and argued in such a manner which can only be construed so as to inflame the passion and arouse the prejudice of the local jury." It is well-established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. See State v. Carruthers, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

Initially we note that the appellant did not object to any statements during the State's rebuttal closing argument. Ordinarily, absent such contemporaneous objection, the appellant would have waived this issue. See Tenn. R. App. P. 36(a); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992). Nevertheless, we conclude that the State did not commit reversible error by making the statements.

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In connection with this issue, we must examine the following factors:

> "(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case[;]
>
> (2) the curative measures undertaken by the court and the prosecution[;]
>
> (3) the intent of the prosecutor in making the statement[;]
>
> (4) the cumulative effect of the improper conduct and any other errors in the record [; and]

-6-

(5) the relative strength or weakness of the case."

Id. (quoting Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

During the appellant's closing argument, the appellant repeatedly questioned the adequacy of the police investigation. In pertinent part, the appellant, in closing, stated:

> You should not look at only one witness as having bias or prejudice, you should assume there's bias and prejudice in all of us, because we all do have bias and prejudice. . . . [L]aw enforcement people are going to have a bias in favor of trying to protect other law enforcement people in doing what they can to do that. . . . I simply ask that you look at the credibility, look at what the person has to gain or lose, and to judge the credibility of these folks. . . .
>
> In this case, what you find is you find a fundamentally flawed investigation that resulted in bogus charges. . . .
>
> So, ladies and gentlemen, whenever you think about this case, I ask you to consider what you heard. Do police officers ever misrepresent the truth? That should be a concern. Have you ever been accused of something you didn't do and them find that the facts started a media as it came along? Well, it may be that way in this case. . . . [After the grand jury,] [w]e start having some changes in testimony. We started having some basic changes in what happened. . . .
>
> . . . I ask that you return a not guilty verdict, and I'm asking that you send a signal to the law enforcement community that you want to see good police work, we want to be safe in our homes, but we don't want innocent people put in prison.

Thereafter, the State commenced its rebuttal closing argument. During the rebuttal closing, the State made the following comments, which comments are the basis of the appellant's complaint on appeal:

> I told you you'd hear that. It's all the police's fault, that it's a shoddy investigation, let's send a message to the community; the police officers are a bunch of liars; they're a bunch of incompetents; that somehow they've come up here in conspiracy to get this innocent man sent to prison.
>
> . . . .

Did you hear what [the appellant] told you, that police officers misrepresent the truth in an effort to sent and [sic] innocent man to the penitentiary.

The appellant argues that the State's comments were singularly designed to inflame the passions of the jury "when there is simply no notation whatsoever in the entirety of the record that [the appellant] suggested any of the law enforcement officials were liars." However, based upon our review of the closing arguments, we conclude that the State's rebuttal closing argument is clearly in response to the appellant's insinuations during closing. See State v. Timothy Wayne Holland, No. M2001-03129-CCA-R3-CD, 2002 WL 31007428, at *6 (Tenn. Crim. App. at Nashville, Sept. 4, 2002). Accordingly, we can discern no impropriety by the State in its closing. This issue is without merit.

## D. Jury Instructions

The appellant contends that "[t]he trial court erred in refusing to include a jury charge with respect to the issue of circumstantial evidence in accordance with the rules as stated in Marable v. State, 313 S.W.2d 451 (Tenn. 1958)." Initially, we note that the appellant did not complain regarding the jury instructions at trial, arguably waiving this issue on appeal. See Tenn. R. App. P. 3(e). Moreover, the appellant has failed to include the jury instructions in the record for our review, depriving this court of our ability to determine the propriety of the jury charge. See Tenn. R. App. P. 24(b) (stating that "the appellant shall have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal"). "In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Accordingly, the appellant is not entitled to relief on this issue.

## E. Ineffective Assistance of Counsel

As his final issue, the appellant contends that his trial counsel was ineffective in failing to request a continuance so that a subpoenaed witness could be brought before the court and in failing to have expert testing conducted "to determine the amount of [fuel] as might be necessary to produce a fire as alleged." A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). However, we will review the post-conviction court's conclusions of law purely de novo. Id.

"To establish ineffective assistance of counsel, the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)). In evaluating whether the petitioner has met this burden, this court

must determine whether counsel's performance was within the range of competence required of attorneys in criminal cases.  See Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).  Moreover,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim.  Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697, 104 S. Ct. at 2069).

We note that this court has repeatedly cautioned that

> the practice of raising ineffective assistance of counsel claims on direct appeal is "fraught with peril" since it "is virtually impossible to demonstrate prejudice as required" without an evidentiary hearing. Instead, "ineffective assistance of counsel claims should normally be raised by petition for post-conviction relief."

State v. Blackmon, 78 S.W.3d 322, 328 (Tenn. Crim. App. 2001) (citations omitted); see also State v. Anderson, 835 S.W.2d 600, 607 (Tenn. Crim. App. 1992).

The appellant raises two claims of ineffective assistance.  First, he contends that "trial counsel received an affidavit from a Tony Barrett and such statement clearly identifies Mr. Barrett would testify that the perpetrator of the alleged crime was a Timmy Elkins and not the [appellant]." Barrett was subpoenaed to testify at the appellant's trial.  However, Barrett did not appear.  After two witnesses testified that Elkins confessed to the crime, trial counsel rested.  The appellant argues that trial counsel should have moved for a continuance until Barrett's presence could be obtained. However, the record reflects that the substance of Barrett's testimony, that Elkins was the perpetrator, was a common theme in trial counsel's cross-examination of the State's witnesses and in the testimony of two defense witnesses, Marilyn Dean Acott and Tammy Jo Parker.  Therefore, this testimony was before the jury, and Barrett's testimony would have been cumulative.  See Howard Eugene Buchanan v. State, No. M2003-01815-CCA-R3-PC, 2004 WL 1114589, at *6 (Tenn. Crim. App. at Nashville, May 19, 2004), perm. to appeal denied, (Tenn. 2004).  Thus, the petitioner has been unable to establish prejudice in this regard.

Finally, the appellant claims that "trial counsel's failure to request that the liquid as confiscated in the gas can be tested by such means and manner as to determine whether such liquid was in such quantity as to even have the possibility of causing the fire at issue left a most basic issue unresolved."  In other words, the appellant argues that trial counsel was ineffective by failing to have an expert determine how much fuel would have been required to cause the fire and thus determine if the amount of fuel missing from the gas can would have been sufficient to cause the

fire.

At the appellant's motion for new trial, the appellant testified:

> I asked [trial counsel] to, you know – like I said before, I asked [trial counsel] would he file for an expert to go check it out and everything and determine how much fuel it would have used and everything. And [trial counsel] said I don't think we need that. I think we already have enough the way it is.

Additionally, the appellant conceded that he did not have a specific expert in mind but he was "sure there is people out there – experts out there that can do that." He also conceded that he did not know if it was even possible for an expert to determine the amount of fuel required to produce the fire that occurred at the Burnetts' home.

From the foregoing, we conclude that the appellant has again failed to prove that he was prejudiced by trial counsel's representation. The appellant presented no proof that the test could be performed nor was there proof that the results of such test would prove favorable to the appellant. Therefore, the appellant is not entitled to relief on this issue.

### III.  Conclusion

Based upon the foregoing, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE